Filed 7/15/26  P. v. Barragan CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JORGE ADRIAN SANCHEZ BARRAGAN,<br><br>    Defendant and Appellant. | D086163<br><br>(Super. Ct. No. RIF2102555) |

APPEAL from a judgment of the Superior Court of Riverside County, Samah Shouka, Judge.  Reversed and remanded for resentencing.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Arlene A. Sevidal, Assistant Attorney General, Andrew Mestman and James M. Toohey, Deputy Attorneys General, for Plaintiff and Respondent.

## I.  INTRODUCTION

A jury found defendant Jorge Adrian Sanchez Barragan guilty of several sex offenses against adult victim S.C. and, in unrelated incidents,

against minor victim J.W. The trial court sentenced defendant under the One Strike law (Pen. Code,[1] § 667.61)[2] to an aggregate prison term of six years, plus 200 years to life, plus life without the possibility of parole (LWOP). Defendant raises three issues on appeal.

First, defendant challenges the sufficiency of the evidence supporting his conviction for rape in concert (§ 264.1) of S.C., arguing there is insufficient evidence that he or his accomplice used force during the commission of the offense. We disagree. S.C. testified that defendant removed her clothes while defendant's accomplice pulled her from the front seat of her car to the back seat of her car, where the accomplice raped her. This use of force is sufficient to sustain defendant's conviction for rape in concert.

Second, defendant contends the trial court erred under section 654 by imposing concurrent sentences on three separate convictions arising from the same single act. (See § 654 [prohibiting multiple punishments for a single act]; *People v. Duff* (2010) 50 Cal.4th 787, 796 (*Duff*) [" 'the imposition of concurrent sentences is precluded by section 654' "].) Defendant argues we should remand for the trial court to exercise its sentencing discretion in determining which sentence to impose and which duplicative sentences to stay. The People agree the trial court erred in imposing concurrent sentences but contend remand is unnecessary because the trial court is presumed to

---

[1] Statutory references are to the Penal Code unless otherwise indicated.

[2] The One Strike law "provides an alternative, harsher sentencing scheme for enumerated forcible sex offenses . . . that are committed under specified circumstances." (*People v. Williams* (2024) 17 Cal.5th 99, 117 (*Williams*).)

2

have understood and exercised the scope of its sentencing discretion under section 654. We agree with the parties that the trial court erred in imposing concurrent sentences. We also agree with defendant that remand is necessary for the trial court to exercise informed sentencing discretion under section 654.

Finally, defendant contends his sentence is cruel and unusual under the United States and California constitutions. Because he did not raise this fact-specific argument in the trial court, he has forfeited the issue for appeal. Defendant may raise this issue during resentencing on remand.

Accordingly, we reverse the judgment and remand for the limited purpose of allowing the trial court to exercise its sentencing discretion under section 654 as further specified in this opinion, and to fully resentence defendant.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background[3]

From 2017 to 2019, defendant stayed with his friend Maria M. and her family (her husband Joseph, their four minor children,[4] and some of Maria's adult brothers) in their Jurupa Valley home. Defendant met Maria when she worked at a convenience store where defendant was a regular customer. In

---

[3] Because defendant's appeal implicates the substantial evidence standard of review, we summarize the evidence and state the relevant facts in the light most favorable to the judgment. (*People v. Jennings* (2010) 50 Cal.4th 616, 638 (*Jennings*).)

[4] At the time of trial in 2024, J.W. was 15 years old, and the other children were 13, 11, and 9.

connection with separate incidents that occurred while defendant was living with Maria's family, defendant was charged with sexually assaulting Maria's adult friend, S.C., and sexually abusing Maria's minor daughter, J.W.

### 1. Prosecution Evidence

### a. Sexual Assault of S.C.

In 2018, S.C. was living with her "best friend" and "on and off" boyfriend, Micah, as well as his parents. S.C. began working at the same convenience store as Maria, and the two women became friends. Through Maria, S.C. met and became friends with defendant and with Maria's brother A.M. A.M. was "best friends" with defendant. A.M. and S.C. were occasionally intimate with each other.

On the afternoon of January 31, 2019, when S.C. was 22 years old, she had an argument with Micah. S.C. drove from Micah's house to Maria's house and texted defendant to let him know she was on the way.

S.C. testified she may have engaged in sexual relations with A.M. upon arriving at Maria's house.[5] S.C then greeted defendant and sat with him in her car as she "vented" about her argument with Micah. S.C. sat in the passenger seat and defendant sat in the driver's seat.

After S.C. and defendant talked in her car for about 15 to 20 minutes, another of Maria's friends, codefendant Angel Fuentes,[6] drove up and parked

---

[5]     A.M. testified that S.C. suggested they be intimate but that he went to take a shower first because he had just arrived home from work.

[6]     Defendant and Fuentes were tried jointly before separate juries. Fuentes's jury heard evidence only regarding S.C. Fuentes is not a party to this appeal.

next to S.C.'s car. Fuentes was friends with defendant but had only met S.C. once at the convenience store. S.C. chatted car-to-car with Fuentes and eventually invited him into her car. Fuentes accepted and got in the rear driver's side seat behind defendant, bringing along a bottle of vodka. The group talked and S.C. and Fuentes drank vodka. S.C. testified she did not recall what they talked about, but she knew it was not sexual.

S.C.—a self-described "lightweight" who only drank alcohol once before—drank about seven sips of the vodka on an empty stomach and started "blacking out."[7] When S.C. regained consciousness, one of her pant legs was off and the other was pulled down; defendant was orally copulating her and digitally penetrating her vagina; and Fuentes was touching her breasts and kissing her neck. She had not given either man permission to do this. S.C. blacked out again.

When S.C. woke up a second time, her head was "slouched over" her car's center console and Fuentes was thrusting his penis in and out of her mouth from the backseat. S.C. blacked out again.

S.C. regained consciousness a third time to find she was "being pulled . . . under [her] arms by [Fuentes] into the backseat" as defendant pulled her pants off the rest of the way and removed her boots. S.C. told the

---

7    S.C. testified that each sip was less than a shot of alcohol. Maria testified that when she left for work the night of the incident she saw S.C. drinking vodka and thought S.C. "was drunk." A.M. testified he saw S.C. "downing th[e] stuff" straight from the bottle and that he previously told an investigator that S.C. appeared drunk. By the time of trial, A.M. felt that S.C. had "disrespected" him and used him for emotional support and that he then believed S.C. *appeared* drunk but was faking it.

5

men, "No," but did not recall whether the men could hear it.[8] S.C. blacked out again and woke up "like a dead weight" on top of Fuentes with his penis penetrating her vagina and defendant's finger penetrating her anus. S.C. told the men "no" again but they did not stop. S.C. heard Fuentes ask defendant if he wanted to switch places. When S.C. said she was not on birth control, Fuentes withdrew his penis from her vagina and masturbated until he ejaculated.

S.C. "came to" after being "thrown off of [Fuentes]," completely naked. She heard the men say that somebody was coming. Fuentes ran out of the car and drove off in his own car with "tires screeching." S.C. heard A.M. argue with defendant and punch him. A.M. then checked on S.C., who told him, "I think I was raped."[9] S.C. blacked out again and later woke up, fully clothed, with A.M. driving her in her car to Micah's home.[10]

When S.C. got home, she told Micah she had been raped. Micah encouraged her to call 911 and then took her to the sheriff's station to file a report.

---

[8] S.C. acknowledged on cross-examination that she previously told an investigator, "I remember saying 'no' but not loud. I remember saying it quiet, probably quietly." S.C. also told a different investigator, "And I remember telling them. I don't know if it was loud, but it was loud enough for me and loud enough for me to know that at least I said 'no.' "

[9] A.M. testified that although S.C. told him she had been raped, S.C. was "a liar" and he was "100 percent sure she didn't get raped." When asked if he thought the incident was "[S.C.]'s fault," A.M. testified: "I don't *think*. I *know*."

[10] A.M. told an investigator about a month after the incident that he put S.C.'s clothes back on her because "she actually couldn't do it on her own because she was kind of like wasted and passed out in the car." At trial, A.M. reiterated his claim that S.C. was merely pretending to be drunk.

From the station, Micah took S.C. to a hospital for a forensic sexual assault exam. A sexual assault nurse examined S.C. and collected multiple swabs for DNA analysis. The nurse observed no redness or abrasions in S.C.'s vaginal area but observed two abrasions in S.C.'s "perianal area, which is the area outside of the rectum."

The day after the incident, S.C. quit her job at the convenience store where she met defendant and Maria.

A criminalist with the State Department of Justice testified about her comparison of the swabs collected from S.C. and DNA reference samples collected from defendant and Fuentes. As to defendant, the DNA analysis showed "very strong support" for his inclusion as a contributor to DNA collected from S.C.'s perianal area; "limited support," which is "not sufficient to . . . determine inclusion or exclusion of a person," as to DNA collected from S.C.'s right breast; and exclusion of defendant as a contributor to DNA collected from S.C.'s vaginal area and left breast.[11]

### b. Sexual Abuse of J.W.

As noted, between 2017 and 2019, defendant lived with Maria and her family. Maria and her husband Joseph shared one bedroom in their two-bedroom residence; their four children shared the other bedroom; and defendant slept on a couch in the living room. Defendant babysat the children when Maria and Joseph were away—in addition, Maria worked two jobs and was often gone with her boyfriend, while Joseph worked long shifts

---

[11] As to Fuentes, there was "very strong support" for his inclusion as a contributor as to the vaginal and breast swabs, and "moderate support" for his inclusion as to the perianal swab.

7

and on some weekends.[12]  Defendant cleaned the house, cooked for the children, and took them to and from school.  In 2019, Maria moved in with her boyfriend; and Joseph, the children, and defendant moved to a different house in Riverside where defendant continued to babysit.

In February 2021, Maria confronted J.W.—then 12 years old—after Maria saw text messages from defendant to J.W. calling J.W. "baby" and telling her, "I love you."  J.W. disclosed that defendant had been "touching her for a long time" and had been showing her X-rated videos.  Maria later found such videos in J.W.'s cellphone history.  Maria reported the abuse to law enforcement.

Sheriff's investigators had J.W. conduct a pretext call with defendant.  For most of the call defendant denied any wrongdoing, but when J.W. threatened to tell her parents if defendant did not admit it, defendant eventually apologized and acknowledged he "touched" J.W.

At trial, J.W. testified about defendant engaging in five specific sexual abuse events.  The first incident occurred about one month before J.W.'s ninth birthday.  While J.W.'s parents were grocery shopping, J.W. was watching television on the couch.  Defendant sat next to her and began touching her thigh.  J.W. told him to stop, but defendant "just kept going" and "ended up putting his fingers inside of" J.W.'s vagina.

The second incident occurred a few weeks later, after J.W. turned nine years old.  Defendant called J.W. into the parents' bedroom, shut and locked the door, and told her to undress and lie on the bed.  After J.W. complied, defendant tied her hands to the wooden bed frame with a ribbon or string.

---

[12]  Maria and her husband experienced relationship challenges.  During these times Maria spent time with a man she considered a boyfriend.

8

Defendant opened J.W.'s legs and inserted his penis into her vagina. J.W. tried to push him off but was unable to. When defendant was finished, he untied J.W. and walked away. J.W. felt pain and saw blood on the bed. J.W. told defendant she was going to tell her dad "because [she] didn't like what [defendant] was doing." Defendant responded that if J.W. did that, defendant "was going to do it to [her] little sister," who was then about seven years old. Defendant repeated this threat "almost every time that he touched [J.W.]"

The third incident occurred about two months after the second one. J.W. woke up on the couch and defendant grabbed her hand and moved it up and down his penis. Defendant then told J.W. to put her mouth on his penis. When J.W. said she did not want to, defendant told her, "It's fine. Just do it." When J.W. complied, defendant used his hands to move her head up and down.

The fourth incident occurred in late 2018 or early 2019, when J.W. was about 10 years old and had just moved to her father's house in Riverside. Defendant summoned J.W. to the garage and offered her a tablet computer if she let him touch her. J.W. agreed. J.W. testified about a bed in the garage and that she briefly laid down on it before getting back up. Defendant then "hugg[ed]" J.W. from behind and put his fingers between her labia and rubbed her clitoris for about 15 minutes.

The final incident occurred a few months later. Defendant grabbed J.W.'s hand and moved it up and down his penis until "white stuff started coming out."

In addition to these specific incidents, J.W. testified more generally that defendant touched her vagina about twice a week from the time she was eight until she was 10.

9

A professor of psychological science testified as a prosecution expert regarding child sexual abuse accommodation syndrome. She identified a series of responses—secrecy, fear, helplessness, accommodation, and delayed disclosure—to dispel misconceptions adults may have about how children disclose sexual abuse. The expert offered her opinions in the abstract; she did not meet J.W. or know any details about the case.

## 2. Defense Evidence

### a. Sexual Assault of S.C.

Defendant testified on his own behalf. On the afternoon of the incident, defendant and S.C. were smoking methamphetamine together in her car when Fuentes arrived with a bottle of vodka and got in the back seat.[13] S.C. and Fuentes drank vodka but S.C.'s demeanor never changed, and she never lost consciousness.

S.C. began discussing sexual matters and stated "she was in the mood for sex." S.C. talked about body piercings, lifted up her shirt to reveal a nipple piercing, and placed defendant's hand on her breast. Defendant "took that as her lead" and began touching S.C.'s genital area on the outside of her pants. When S.C. did not resist, defendant partially pulled down her pants and orally copulated her. S.C. assisted in pulling down her pants and did not resist; rather, she "caress[ed]" and "fondl[ed]" defendant's head and pulled him toward her.

S.C. leaned her upper body to the backseat and began orally copulating Fuentes. Defendant digitally penetrated S.C.'s vagina as she did this. Defendant touched "around" S.C.'s anus but did not penetrate it. He

---

[13] S.C. testified she did not use any drugs on the day of the incident.

10

surmised his long fingernails may have accidentally caused the abrasions she sustained to her perianal area.

S.C.'s pants were around her knees and her top was still on. She "started taking off her clothes" without help from defendant or Fuentes. S.C. eventually removed all her clothes and boots.

S.C. had trouble climbing over the center console to get in the backseat, so Fuentes helped her. Fuentes did not pull S.C. and defendant did not push her. Once in the backseat, S.C. straddled Fuentes and had intercourse with him. S.C. affectionately touched Fuentes's neck and told him "he had very pretty eyes."

After S.C. and Fuentes finished, A.M. came out of the house, opened the back door of S.C.'s car, and asked what was going on. Fuentes got in his car and left. Later that night, defendant told A.M. that S.C. engaged in consensual sexual activity in the car.[14] A.M. told defendant that S.C. said she was raped. A.M. punched defendant later that night.

Defendant testified that his sexual contact with S.C. was consensual and that she was a conscious, willing participant. Defendant admitted he had several prior felony convictions but maintained he was testifying truthfully.

Fuentes also testified on his own behalf. He testified similarly to defendant about the events in S.C.'s car. Fuentes maintained that all the sexual activity was consensual; S.C. was not too drunk to consent; S.C. undressed herself and voluntarily climbed into the backseat without Fuentes pulling her; and that she was never unconscious. Fuentes admitted that he

---

14    Defendant acknowledged on cross-examination that he lied to an investigator about this conversation with A.M.

11

initially lied to investigators about the incident by denying that he had any sexual contact with S.C.

### b. Sexual Abuse of J.W.

Defendant denied J.W.'s allegations. He explained generally that there would not have been any opportunity to be alone with J.W. because someone else was always around. Regarding the incident in the parents' bedroom, defendant testified the parents' bed had no headboard to which to tie a ribbon or string. Regarding the touching incident in the garage, defendant disputed J.W.'s claim that there was a bed in the garage.

Defendant attempted to explain away his admissions during the pretext call. First, he testified he was intimidated by J.W.'s threat to tell her parents because her father "is a very big guy" who owns guns and has many gang-member relatives. Second, "after she just kept persisting, persisting," defendant "felt like it would be easier" to "tell her what she wanted to hear." Finally, defendant explained he took the call while at work and needed to get off the phone to avoid getting in trouble. Defendant also claimed that his apology during the call was for having to end the call, not for abusing J.W.

## B. Procedural Background

### 1. Charges

The People charged defendant with five offenses regarding S.C. and 12 offenses as to J.W.

As to S.C., the People charged defendant with: (1) rape of an intoxicated person (§ 261, subd. (a)(3); count 1); (2) oral copulation of an intoxicated person (§ 287, subd. (i); count 2); (3) vaginal penetration of an intoxicated person by a foreign object (§ 289, subd. (e); count 3); (4) anal

12

penetration of an intoxicated person by a foreign object (§ 289, subd. (e); count 4); and (5) forcible rape in concert (§ 264.1, subd. (a); count 18).[15]

As to J.W., the People charged defendant with: (1) sexual intercourse with a child 10 years of age or younger (§ 288.7, subd. (a); count 6); (2) aggravated sexual assault (rape) of a child under 14 (§ 269, subd. (a)(1); count 7); (3) aggravated sexual assault (oral copulation) of a child under 14 (§ 269, subd. (a)(4); count 8); (4) three counts of aggravated sexual assault (penetration with a foreign object) of a child under 14 (§ 269, subd. (a)(5); counts 9, 10, and 11); (5) three counts of lewd and lascivious acts with force or fear on a child under 14 (§ 288, subd. (b)(1); counts 12, 13, and 14); and (6) three counts of lewd and lascivious acts on a child under 14 (§ 288, subd. (a); counts 15, 16, and 17).

The People asserted special allegations under the One Strike law that there were multiple victims (§ 667.61, subd. (e)(4)); that defendant engaged in tying and binding of a person (*id.*, subd. (e)(5)); and that a victim was under age 14 (*id.*, subd. (j)(1), (2)). The People further alleged as aggravating circumstances as to both victims that they were particularly vulnerable (Cal. Rules of Court, rule 4.421(a)(3)) and that defendant abused a position of trust (*id.*, rule 4.421(a)(11)).

---

[15] Fuentes was also charged with (1) rape of an intoxicated person (§ 261, subd. (a)(3); count 1); (2) oral copulation of an intoxicated person (§ 287, subd. (i); count 5); and (3) forcible rape in concert (§ 264.1, subd. (a); count 18).

### 2. Verdicts and Findings

With one exception—finding defendant guilty of assault as a lesser included offense of rape of an intoxicated person—the jury convicted defendant of the charged counts and found true the One Strike allegations.[16]

In a bifurcated bench trial on the aggravating circumstances, the trial court found that both victims were particularly vulnerable and that defendant violated a position of trust as to J.W. but not as to S.C.

### 3. Sentencing

The trial court imposed an aggregate term of six years, plus 200 years to life, plus LWOP.  This sentence was calculated as follows:

Count 1:  Six months concurrent to count 2.

Count 2:  Six years (midterm).

Count 3:  Two years (one-third the midterm) concurrent to count 2.

Count 4:  Two years (one-third the midterm) concurrent to count 2.

Count 6:  25 years to life concurrent to count 12.

Count 7:  15 years to life concurrent to count 12.

Counts 8–11:  15 years to life per count.

Count 12:  LWOP.

Counts 13–17:  25 years to life per count.

Count 18:  15 years to life

---

[16]    Fuentes's jury found him guilty on all charges.  The trial court sentenced him to five years in prison.

# III.  DISCUSSION

## A.  Substantial Evidence Supports Defendant's Conviction for Rape in Concert

Defendant challenges the sufficiency of the evidence supporting his conviction for rape in concert.  He argues that because he did not have intercourse with S.C., "his conviction under the theory of being an aider and abettor to [Fuentes's] act . . . should not be sustained since there is no substantial evidence to prove the use of force, which is a necessary element of . . . rape in concert" under section 264.1.  Under the applicable substantive law and standard of review, we conclude substantial evidence supports this conviction.

### 1.  Background

The People charged defendant in count 18 with rape in concert in violation of section 264.1.  At the close of the prosecution case, defendant moved under section 1118.1 to dismiss this count for lack of evidence of force.  Defendant argued that S.C.'s testimony that the defendants "repositioned her body in order to perform sex acts" was insufficient because S.C. "suffered no great bodily injury" and the force was no "greater than necessary to accomplish the alleged rape and oral copulation."  The People opposed the motion.

The trial court denied the motion to dismiss.  Citing *People v. Thomas* (2017) 15 Cal.App.5th 1063 (*Thomas*), the court found S.C.'s testimony "that she said no as she was being pulled by Fuentes towards the back and Sanchez was taking off her pants" to be sufficient to establish the force element of rape in concert.  (See *id.* at p. 1071 [holding that the force element of rape is satisfied by "force used to accomplish 'the penetration and the

15

physical movement and positioning of [the victim's] body in accomplishing the act' "].)

The trial court instructed the jury regarding rape in concert (CALCRIM No. 1001), forcible rape (CALCRIM No. 1000), and aiding and abetting (CALCRIM No. 401).

In closing argument, the prosecutor argued defendant was guilty of rape in concert on the theory that he "aided and abetted Mr. Fuentes who personally committed a forcible rape." The prosecutor urged the jury to "[p]ay attention to what the actual law is for this count, because force is just enough force to overcome [S.C.]'s will." The prosecutor maintained this standard was satisfied because "we heard that [S.C.] said no" and that she regained consciousness "as she [was] being pulled to the back, as her clothes are being taken off."

The jury found defendant guilty of rape in concert.

### 2. Relevant Legal Principles

"Under section 264.1, subdivision (a), a defendant commits the crime of rape in concert 'when the defendant, voluntarily acting in concert with another person, by force or violence and against the will of the victim, committed an act described in Section 261 . . . , either personally or by aiding and abetting the other person.' " (*People v. Middleton* (2023) 91 Cal.App.5th 749, 756 (*Middleton*), quoting § 264.1, subd. (a), italics omitted; see § 261, subd. (a)(2) ["Rape is an act of sexual intercourse [¶] . . . [¶] accomplished against a person's will by means of force [or] violence"].) "To find a defendant guilty of rape in concert on an aiding and abetting theory, the jury must find, beyond a reasonable doubt, (1) a perpetrator committed a rape by force or violence and against the will of the victim; (2) the defendant knew the

16

perpetrator intended to commit the rape; (3) before or during the commission of the rape, the defendant intended to aid and abet the perpetrator in committing the crime; and (4) the defendant's words or conduct did in fact aid and abet the perpetrator's commission of the rape." (*Middleton*, at p. 775.)

"There is no special amount of force required to prove forcible rape. The term force as used in the forcible rape statute has 'a common usage meaning, rather than a specialized legal definition.' " (*People v. Torres* (2024) 107 Cal.App.5th 513, 531 (*Torres*), quoting *People v. Griffin* (2004) 33 Cal.4th 1015, 1024 (*Griffin*).) To establish force for purposes of rape in concert, " 'the prosecution need only show the defendant used physical force of a degree sufficient to support a finding that the act of sexual intercourse was against the will of the [victim].' " (*Griffin*, at pp. 1023–1024 [discussing forcible rape under section 261]; see *People v. Mom* (2000) 80 Cal.App.4th 1217, 1219 [the force necessary to commit rape in concert under section 264.1 "is no greater than the force necessary to commit forcible rape within the meaning of . . . section 261, subdivision (a)(2)"], disapproved on another ground in *Griffin*, at p. 1028.)

"[I]n a forcible rape prosecution the jury determines whether the use of force served to overcome the will of the victim to thwart or resist the attack, not whether the use of such force physically facilitated sexual penetration or prevented the victim from physically resisting her attacker. . . . [E]ven conduct which might normally attend sexual intercourse, when engaged in with force sufficient to overcome the victim's will, can support a forcible rape conviction." (*Griffin, supra*, 33 Cal.4th at p. 1027.) "Force includes efforts to move and to position the victim's body." (*People v. Aguilar* (2019) 41 Cal.App.5th 1023, 1026 (*Aguilar*); see *Thomas, supra*, 15 Cal.App.5th at p. 1071 [force "includes the force used to accomplish 'the penetration and the

17

physical movement and positioning of [the victim's] body in accomplishing the act' "]; accord, *Torres, supra*, 107 Cal.App.5th at p. 531.)

" 'In reviewing a challenge to the sufficiency of the evidence, we do not determine the facts ourselves. Rather, we "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citations.] We presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' " (*People v. Houston* (2012) 54 Cal.4th 1186, 1215; see *Jackson v. Virginia* (1979) 443 U.S. 307, 319; *People v. Staten* (2000) 24 Cal.4th 434, 460 ["An identical standard applies under the California [and U.S.] Constitution[s]."].) " 'Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction.' " (*People v. Ramirez* (2022) 13 Cal.5th 997, 1118; see *Jennings, supra*, 50 Cal.4th at p. 638 ["We neither reweigh the evidence nor reevaluate the credibility of witnesses."].) "If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Jennings*, at p. 639.)

### 3. Analysis

Defendant challenges only the force element of rape in concert. On the record before us, we conclude substantial evidence supports this conviction.

18

S.C. testified that as she regained consciousness, Fuentes was pulling her to the backseat and defendant was removing her clothes. By saying "no," S.C. established that their conduct was against her will. By persisting in pulling S.C. to the backseat and removing her clothes, the defendants used sufficient force to overcome S.C.'s will. (See *Thomas, supra*, 15 Cal.App.5th at p. 1072 ["A reasonable jury could find . . . that defendant used sufficient force to overcome [the victim's] will by leading her by the hand into the bathroom . . . [and] positioning her body on the sink before digitally penetrating her."]; *Aguilar, supra*, 41 Cal.App.5th at p. 1026; *Torres, supra*, 107 Cal.App.5th at p. 531.) Although it was Fuentes who used the force that repositioned S.C., defendant's assistance in removing her clothes supports his conviction on an aiding and abetting theory, which defendant does not otherwise contest. (See, e.g., *Middleton, supra*, 91 Cal.App.5th at pp. 759–761, 775–776 [substantial evidence supported female defendant's rape in concert conviction based on aiding and abetting where she led the victim to a room where a male accomplice forcibly raped the victim].)

Defendant argues in his opening brief on appeal that the force element was not met because the analogous context of forcible lewd act on a child requires force that is "substantially different from or substantially greater than [the force needed] to accomplish the . . . act itself." (*People v. Jimenez* (2019) 35 Cal.App.5th 373, 391.) In his reply brief, however, defendant acknowledges that the courts have held this standard does not apply to forcible rape. (See *Griffin, supra*, 33 Cal.4th at p. 1027.)

Defendant also reargues the strength of the prosecution evidence by noting conflicting evidence suggesting S.C. may have undressed herself, said "no" quietly, or willingly participated in the intercourse with Fuentes. Defendant also cites his and Fuentes's own self-serving testimony. These

arguments ignore the substantial evidence review standards under which "[w]e accept all evidence supporting the judgment, disregard contrary evidence, and draw reasonable inferences in favor of the verdict." (*Aguilar, supra*, 41 Cal.App.5th at p. 1026.) Under this standard, defendant has not overcome his "enormous burden." (*Ibid.*)

## B. We Must Remand for Resentencing with the Trial Court's Informed Discretion Under Section 654

Three of defendant's convictions—sexual intercourse with a child 10 years or younger (§ 288.7, subd. (a); count 6), aggravated sexual assault (rape) of a child under 14 years old (§ 269, subd. (a)(1); count 7), and lewd and lascivious acts with force or fear on a child under 14 years old (§ 288, subd. (b)(1); count 12)—were based on the same single act of defendant having sexual intercourse with J.W. while she was tied to her parents' bed. The trial court sentenced defendant under the One Strike law to LWOP on count 12 and imposed concurrent sentences on count 6 (25 years to life) and count 7 (15 years to life).

Defendant contends the trial court's imposition of concurrent sentences on counts 6 and 7 violates section 654's prohibition on multiple punishments for a single act. Defendant maintains the trial court should have stayed punishment on two of the three convictions arising from the single act and that we should remand for resentencing because the trial court misunderstood the scope of its sentencing discretion; that is, that the court mistakenly believed it had no discretion to stay the LWOP sentence on count 12 and to impose one of the shorter sentences on counts 6 or 7.

The People agree the concurrent sentences on counts 6 and 7 should have been stayed as duplicative under section 654 and that the trial court

20

had the discretion to select which of the three duplicative punishments to impose and which to stay. The People disagree, however, that remand for resentencing is necessary because the People maintain that the trial court is presumed to have understood the scope of this discretion.

We agree with the parties that the trial court erred by imposing concurrent sentences and that the court had the discretion under section 654 to select which duplicative punishment to impose and which to stay. On the record here, however, we conclude the trial court was unaware it had this discretion. Accordingly, we remand for resentencing.

### 1. Background

During closing argument, the prosecutor repeatedly confirmed that counts 6, 7, and 12 were "duplicative" and all arose from the same act of defendant tying J.W. to her parents' bed and having sexual intercourse with her. As noted, the jury found defendant guilty on all three counts.

At the sentencing hearing, the trial court first addressed the convictions relating to S.C. After stating it had "considered . . . section 654," the court asked the prosecutor for her view on "whether . . . the Court has discretion to run the time as it relates to S.C. 654 to each other." The prosecutor responded that "the court does have discretion" because "[t]here's no mandatory consecutive sentencing with her except . . . that [c]ount 18 [rape in concert] is a forcible sex crime, which makes it mandatory consecutive." The court imposed concurrent sentences on counts 2, 3, and 4 pertaining to S.C.

The trial court then "move[d] on to the more serious counts" involving J.W. The court opined that it "has no discretion here in terms of imposing sentence because there's only one option if state prison is found to be

21

appropriate and probation is denied." The court concluded probation was "not an option," and "[e]ven if it were," the court "would not grant probation because the situation as it relates to J.W." was "terrible and horrific" and the court "personally agree[d] with [the jury's] verdict."

The trial court and counsel initially agreed that the court had to impose consecutive sentences on counts 6 and 7 because they involved sexual assault on a child. (See § 269 ["[t]he court shall impose a consecutive sentence for" certain sex offenses against children under 14 "if the crimes involve separate victims or involve the same victim on separate occasions"].) But after the prosecutor confirmed that counts 6, 7, and 12 all arose from the same act, and that count 12 required an LWOP sentence, the court concluded that its "only option . . . to run any time concurrent would be counts 6 and 7 to [c]ount 12."

Accordingly, the trial court imposed sentence on counts 6, 7, and 12 as follows: "[L]et's start with [c]ount 12 then. · That [c]ount is punishable by only one option pursuant to [section] 667.61[, subdivision] (j)(1), which is the indeterminate period of life in prison without the possibility of parole because of the binding allegation. So the [c]ourt will impose that. Concurrent to that, I will impose [c]ount 6[,] 25 to life in state prison. Concurrent to that, I will impose [c]ount 7[,] 15 years to life. That's the only options."

Later in the sentencing hearing, the court revisited its sentence on these counts: "As to [c]ount 12, the [c]ourt must impose life without the possibility of parole. [¶] . . . [¶] So just to reiterate so that it's as clear as mud[.] [F]or [c]ount 12, [the] [c]ourt must impose life without the possibility of parole. I'm running [c]ount[s] 6 and 7 concurrent with [c]ount 12."

After announcing defendant's aggregate sentence, the court concluded with the following comments:

22

"It doesn't give me any joy to impose such a harsh consequence for anyone, even in horrific cases like this.

"[Defendant], I know where this all stemmed from and that was from drug use. I think without . . . that lifestyle choice[ ] you would not be in this position, but I believe (J.W.). The jury believed her. I respect what the jury does. But I want to say I believed her as well. And those horrific acts have lifetime consequences on the people, both on the victim and of course on the perpetrators. It is a harsh consequence.

"I try to run whatever counts I could concurrent. But the amount of time, that's all determined by the Legislature— the legislation. I tried to do the best I can, um, with going through all of the different factors. So it's not joyous for anyone, but it's the conclusion of a really horrific set of facts. So wish you the best to everyone."

## 2. Section 654 Authorizes a Stay of One Strike Sentences

Defendant's sentencing challenge involves the interplay between different Penal Code sentencing provisions: section 654, which generally prohibits double punishment for a single act; and the One Strike law, which "is an alternative sentencing scheme that applies when the prosecution pleads and proves specific aggravating circumstances in connection with certain sex offenses." (*In re Vaquera* (2024) 15 Cal.5th 706, 712, fn. omitted.)

Section 654, subdivision (a) states: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." "[W]hen a court determines that a conviction falls within the meaning of section 654, it is necessary to *impose* sentence but to stay the *execution* of the duplicative sentence." (*Duff, supra,* 50 Cal.4th at p. 796; *People v. Mani* (2022) 74 Cal.App.5th 343, 380 (*Mani*) ["The trial court is required to impose judgment on each count, which

involves selecting a term, and then staying execution of the duplicative sentence, the stay to become permanent upon defendant's service of the portion of the sentence not stayed."].) "[T]he imposition of concurrent sentences is precluded by section 654 [citations] because [under such a sentence] the defendant is deemed to be *subjected* to the term of *both* sentences although they are served simultaneously." (*Duff*, at p. 796.)

Before it was amended effective January 1, 2022, section 654 required the sentencing court "to impose the sentence that 'provides for the longest potential term of imprisonment' and stay execution of the other term." (*Mani, supra*, 74 Cal.App.5th at p. 379; see Stats. 1977, ch. 165, § 11, p. 644 [adding the longest-sentence requirement].) As amended, "section 654 now provides the trial court with discretion to impose and execute the sentence of either term, which could result in the trial court imposing and executing the shorter sentence rather than the longer sentence." (*Mani,* at p. 379.)

The One Strike law (§ 667.61) "provides an alternative, harsher sentencing scheme for enumerated forcible sex offenses—including rape, rape or sexual penetration in concert, lewd or lascivious acts, forcible sexual penetration, sodomy, oral copulation, or continuous sexual abuse of a child— that are committed under specified circumstances." (*Williams, supra*, 17 Cal.5th at p. 117.) "In general, the length of a One Strike term depends on the number and nature of applicable aggravating circumstances found by the trier of fact." (*Id.* at p. 118)

One provision of the One Strike law, subdivision (h) of section 667.61 (section 667.61(h)), states: "Notwithstanding any other law, probation shall not be granted to, *nor shall the execution or imposition of sentence be suspended for*, a person who is subject to punishment under this section." (Italics added; we will sometimes refer to the italicized clause as "the

suspension clause.") There is a split of authority over whether this provision precludes a sentencing court from staying execution of a One Strike sentence under section 654.

In *People v. Caparaz* (2022) 80 Cal.App.5th 669 (*Caparaz*), the court held that section 667.61(h) prevails over section 654 and precludes a trial court from staying execution of a One Strike sentence. (*Caparaz*, at p. 690.) The *Caparaz* defendant argued on appeal that "section 667.61(h) means that a trial court is prohibited from granting probation for a One Strike law offense and nothing more." (*Caparaz*, at p. 689.) The appellate court rejected this argument, reasoning (1) the "plain meaning" of section 667.61(h)'s suspension clause precludes a stay under section 654 because "a stay is a type of suspension; thus, a prohibition against suspending a sentence necessarily prohibits the stay of a sentence"; (2) a contrary reading would render the suspension clause "meaningless" "surplusage"; (3) section 667.61(h)'s introductory clause stating that it applies "[n]otwithstanding any other law" indicates the Legislature intended it to prevail over other statutes; and (4) "[t]his reading . . . serves the purpose of the One Strike law, which is 'to increase the penalties imposed on defendants who commit certain sexual offenses under specified circumstances.' " (*Caparaz*, at pp. 689–690.)

The court in *People v. Govan* (2023) 91 Cal.App.5th 1015 (*Govan*) disagreed with *Caparaz*. (*Govan*, at p. 1032.) The *Govan* court acknowledged that the plain meaning of "suspend[ ]" in section 667.61(h) conceivably encompasses a stay under section 654 because "a stay under section 654 has the effect of suspending a sentence until a specific contingency, that is, until the sentence imposed on another count is served." (*Govan*, at p. 1032.) But the *Govan* court rejected a plain meaning interpretation because section

667.61(h) uses "precise language" that differs from the "language . . . and purpose" of section 654.

Addressing the different "language" (*Govan, supra*, 91 Cal.App.5th at p. 1032), the *Govan* court explained that the phrase "nor shall execution or imposition of sentence be suspended" in section 667.61(h) is "terminology . . . unique to a grant of probation." (*Govan*, at p. 1033.) That is, the Legislature was referring to suspension of execution or imposition of sentence only as a means of implementing a grant of probation and not as to stays of sentence, more generally. (*Ibid*.)

Regarding the different "purpose[s]" (*Govan, supra*, 91 Cal.App.5th at p. 1032) of sections 667.61(h) and 654, the *Govan* court explained that although the purpose of the One Strike law, generally, " 'is to increase the punishment for forcible sex offenses' " (*Govan*, at p. 1034), its "legislative history . . . shows the intent of the Legislature in enacting section 667.61, subdivision (h), was to prohibit trial courts from placing one strike offenders on probation, not to extend the section's reach to bar other forms of suspended sentences" (*Govan*, at p. 1033). For example, while "one purpose" of the bill adding the One Strike law "was to add more sex offenses to the list of sex offenses ineligible for probation," the same legislative history "contains no discussion of whether sentences for sex offenders may be stayed under section 654." (*Govan*, at p. 1034, citing Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1X 26 (1993–1994 Reg. Sess.) as amended May 4, 1994, p. 7 ["Existing law *prohibits probation* for a person who is convicted of [certain specified sex offenses]. This bill would add to that list . . . ." (italics added)].)

By contrast, *Govan* observed that our Supreme Court has " 'often said that the purpose of section 654 "is to ensure that a defendant's punishment will be commensurate with his culpability." ' " (*Govan, supra*, 91 Cal.App.5th

26

at p. 1034, quoting *People v. Latimer* (1993) 5 Cal.4th 1203, 1211; accord, *People v. Hicks* (2017) 17 Cal.App.5th 496, 513–514 (*Hicks*) ["The purpose of section 654 is to ensure that a defendant's punishment is commensurate with his culpability and that he is not punished more than once for what is essentially one criminal act."].)

The *Govan* court also found its analysis consistent with the legislative history of related statutes. (*Govan, supra*, 91 Cal.App.5th at pp. 1034–1035.) For example, the same bill that enacted the One Strike law also amended section 1203.066, "which, with limited exceptions, prohibits a grant of probation to individuals convicted of lewd or lascivious acts on a child (§ 288) and continuous sexual abuse of a child (§ 288.5)." (*Govan*, at p. 1034.) The amendment to section 1203.066 added the italicized language in the following passage: " 'Notwithstanding Section 1203 *or any other law*, probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for, nor shall a finding bringing the defendant within the provisions of this section be stricken pursuant to Section 1385 for' any person convicted of violations of section 288 or 288.5." (*Govan*, at pp. 1034–1035, fn. omitted.) As *Govan* observed, while committee analysis of this bill explained that the purpose of this clause was to " 'specify that the prohibition on granting probation takes precedence over any other law or exception[ ]' [Citation], . . . nothing in the legislative history reflects an intent in amending section 1203.066, subdivision (a), to prohibit application of section 654 to sentences imposed under that section." (*Govan*, at p. 1035.)

Similarly, the *Govan* court noted that the Legislature amended section 667.61(h) in 2006 to conform it to section 1203.066 "by adding the prefatory language . . . , 'Notwithstanding any other provision of law.' " (*Govan, supra*, 91 Cal.App.5th at p. 1035.) "In light of this amendment of section 667.61,

27

subdivision (h), to track the language of section 1203.066, subdivision (a)," the *Govan* court found "it . . . reasonable to read the 2006 amendment to section 667.61, subdivision (h), consistent with the 1994 legislative history of section 1203.066, subdivision (a)." That "both sections now prohibit a trial court from granting probation to specified sex offenders—but not from staying the sentence under section 654—regardless of what any other law might provide." (*Govan*, at p. 1035.)

The parties here agree that *Govan* has the better reasoned view of the interplay between section 667.61(h) and section 654. We also agree and offer a few additional observations to support the conclusion.

" ' "When we interpret a statute, '[o]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. . . . If the language is clear, courts must generally follow its plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend. If the statutory language permits more than one reasonable interpretation, courts may consider other aids, such as the statute's purpose, legislative history, and public policy.' [Citation.] 'Furthermore, we consider portions of a statute in the context of the entire statute and the statutory scheme of which it is a part, giving significance to every word, phrase, sentence, and part of an act in pursuance of the legislative purpose.' " ' " (*People v. Reynoza* (2024) 15 Cal.5th 982, 989–990 (*Reynoza*).)

Beginning with the statutory text, we recognize that the plain meaning of "suspend[ ]" in section 667.61(h) conceivably includes a stay under section 654. (See *Caparaz, supra*, 80 Cal.App.5th at p. 689.) But applying that plain meaning would likely lead to absurd results the Legislature did

28

not intend.  (See *Reynoza, supra*, 15 Cal.5th at p. 989 ["courts must generally follow [a statute's] plain meaning unless a literal interpretation would result in absurd consequences the Legislature did not intend"].)  Here, for example, construing section 667.61(h)'s suspension clause to preclude a section 654 stay would lead to the absurd result of imposing three separate One Strike sentences—LWOP, 25 to life, and 15 to life—for a single act.  This is precisely the type of result the Legislature sought to avoid by enacting section 654.  (See *Hicks, supra*, 17 Cal.App.5th at pp. 513–514.)

Moreover, courts have recognized that the suspension clause's language has a technical meaning "unique to a grant of probation."  (*Govan, supra*, 91 Cal.App.5th at p. 1033; see, e.g., *People v. Superior Court* (*Himmelsbach*) (1986) 186 Cal.App.3d 524, 536, fn. 8 (*Himmelsbach*) ["the words 'suspension of execution' are employed in conjunction with a grant of probation" and "have developed into terms of art"], disapproved on another ground by *People v. Norrell* (1996) 13 Cal.4th 1, 7, fn. 3; *People v. Borynack* (2015) 238 Cal.App.4th 958, 965 ["the phrase 'suspend execution of a sentence' is a term of art"].)  Indeed, "[a]s used in [the Penal] [C]ode, 'probation' means *the suspension of the imposition or execution of a sentence* and the order of conditional and revocable release in the community under the supervision of a probation officer."  (§ 1203, subd. (a), italics added.)  " '[W]hen the Legislature uses a term of art, a court construing that use must assume that the Legislature was aware of the ramifications of its choice of language.' "  (*Ruiz v. Podolsky* (2010) 50 Cal.4th 838, 850, fn. 3; see § 7, subd. (c) ["[T]echnical words and phrases" in the Penal Code "shall be construed according to that peculiar and appropriate meaning."].)  We therefore conclude the Legislature intended for section 667.61(h)'s suspension clause to have its technical, probation related meaning.

This interpretation is consistent with how some courts have interpreted similarly worded statutes.  (See *People v. Gonzalez* (2017) 2 Cal.5th 1138, 1141 [" '[W]e consider the language of the entire scheme and related statutes, harmonizing the terms when possible.' "].)  Many related criminal statutes with related purposes contain language identical to section 667.61(h).[17]  Courts have not historically interpreted similar statutory provisions as precluding a stay under section 654.  (See, e.g., *People v. Barela* (1983) 145 Cal.App.3d 152, 160 (*Barela*) [holding section 1203.06 does not preclude a

---

[17]     See §§ 1203, subd. (k) ["Probation shall not be granted to, nor shall the execution of, or imposition of sentence be suspended for," a person convicted of a violent or serious felony who was on probation at the time of the current offense]; 1203.06, subd. (a) ["Notwithstanding any other law, probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for," a person who used firearms during the commission of enumerated serious and violent felonies]; 1203.065, subd. (a) ["Notwithstanding any other law, probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for," persons convicted of enumerated sex offenses); 1203.066, subd. (a) ["Notwithstanding Section 1203 or any other law, probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for," persons convicted of enumerated sex offenses]; 1203.075, subd. (a) ["Notwithstanding any other law, probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for," persons who personally inflicted great bodily injury upon another during the commission of certain offenses]; 1203.08, subd. (a) ["Notwithstanding any other law, probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for," persons convicted of designated felonies who were previously convicted of at least two prior designated felonies within 10 years]; 1203.09, subd. (a) ["Notwithstanding any other law, probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for," persons who committed designated crimes against elderly or disabled victims]; 12022.53, subd. (g) ["Notwithstanding any other law, probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for," persons found to have used firearms during the commission of designated crimes].)

stay under section 654]; *Himmelsbach, supra*, 186 Cal.App.3d at p. 536, fn. 8 [rejecting as "unpersuasive" the contention that a prohibition on " 'suspension of execution' of sentence" under repealed section 12311 "precluded a stay under section 654"]; but see *People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1314 [holding that section 654 did not require a stay of a firearm *enhancement* under section 12022.53 because the plain language of the enhancement statute indicated it was mandatory and applied *in addition to* and notwithstanding any other law, and because imposing an enhancement "is not punishing appellant twice for the same act; rather, the law is punishing him once each for the components of that act which make it so dangerous and antisocial"].)

In addition, the Legislature enacted section 667.61 after it enacted many of the similarly worded statutes and courts had construed them as allowing section 654 stays of duplicative sentences. For example, section 1203.06 was enacted in 1975 (see Stats. 1975, ch. 1004, § 2, p. 2357) and construed as not precluding a section 654 stay in 1983 (see *Barela, supra*, 145 Cal.App.3d at p. 160). We presume that when the Legislature enacted section 667.61 in 1994 (see Stats. 1993–1994, 1st Ex. Sess., ch. 14, § 1) and amended it in 2006 (see Stats. 2006, ch. 337, § 33), the Legislature was aware of how courts had interpreted identical statutory language and that the Legislature intended for that interpretation to also apply to section 667.61 (see *People v. Seumanu* (2015) 61 Cal.4th 1293, 1367 [citing "the rule of statutory construction that '[w]here . . . legislation has been judicially construed and a subsequent statute on the same or an analogous subject uses identical or substantially similar language, we may presume that the Legislature intended the same construction, unless a contrary intent clearly appears' "]).

Indeed, nothing in section 667.61's legislative history suggests the Legislature intended a contrary meaning. As the *Govan* court observed, while section 667.61's legislative history "made clear" that "one purpose of the bill was to add more sex offenses to the list of sex offenses ineligible for probation," the legislative history "contains no discussion of whether sentences for sex offenders may be stayed under section 654." (*Govan, supra,* 91 Cal.App.5th at p. 1034, citing Sen. Com. on Judiciary, Analysis of Sen. Bill No. 1X 26 (1993–1994 Reg. Sess.) as amended May 4, 1994, p. 7.) As the *Govan* court noted, this legislative history is consistent with the legislative history of related section 1203.066. (*Govan,* at p. 1035 [explaining that language in section 1203.066 similar to that in section 667.61(h) "was included to ensure probation would not be granted to specified sex offenders regardless of what other laws provided"].)

Another relevant aspect of the statutory landscape that existed when the Legislature enacted the One Strike law is that the version of section 654 then in effect gave trial courts the discretion to stay the longest sentence in favor of imposing and executing a shorter one—as the statute again provides now. (See Stats. 1977, ch. 165, § 11, p. 644;[18] Stats. 1997, ch. 410, § 1 [amending section 654 to require punishment under "the provision that provides for the longest potential term of imprisonment"]; Stats. 2021, ch. 441, § 1 [removing the requirement].) By originally enacting in the One Strike law statutory language that courts had already interpreted as

---

[18]  In 1994, section 654 then provided in relevant part: "An act or omission which is made punishable in different ways by different provisions of this code may be punished under either of such provisions, but in no case can it be punished under more than one . . . ."

32

allowing for a stay under section 654, the Legislature presumably also understood that courts would have discretion under section 654 to stay the longest duplicative sentence in favor of imposing and executing a shorter one.

Finally, we are satisfied that interpreting section 667.61 as allowing a stay under section 654 is consistent with the One Strike law's legislative purpose in imposing lengthy prison sentences for certain sex offenses. (*Reynoza, supra*, 15 Cal.5th at p. 989 [" ' "When we interpret a statute, '[o]ur fundamental task . . . is to determine the Legislature's intent so as to effectuate the law's purpose.' " ' "].)  Although interpreting section 667.61 this way *allows* for shorter sentences in some circumstances, it does not *require* it. Rather, it leaves the decision to the trial court's sound sentencing discretion.

Our interpretation is also consistent with section 654's competing legislative purpose of "ensur[ing] that a defendant's punishment is commensurate with his culpability and that he is not punished more than once for what is essentially one criminal act." (*Hicks, supra*, 17 Cal.App.5th at pp. 513–514.)  As noted, were we to interpret section 667.61(h) as prohibiting a stay of any One Strike sentence, the trial court here would be required to impose three separate One Strike sentences for a single criminal act.  We do not believe the Legislature contemplated such an absurd result.

Therefore, based on the technical meaning of the statutory text, courts' interpretations of related statutes enacted before enactment of section 667.61, the statute's legislative history, and the legislative purposes underlying sections 667.61 and 654, we conclude section 667.61(h)'s suspension clause does not preclude a sentencing court from staying a duplicative One Strike law sentence under section 654 or selecting which duplicative sentence to impose and which to stay.

### 3. Remand for Resentencing Is Necessary

Having concluded the trial court had the discretion under section 654 to select which of defendant's One Strike sentences to stay and which to impose and execute, we must now determine whether the trial court understood it had that discretion. (*People v. Salazar* (2023) 15 Cal.5th 416, 424 [when a sentencing court " 'is unaware of the scope of its discretionary powers[,] . . . the appropriate remedy is to remand for resentencing unless the record "clearly indicate[s]" that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion' "].) The People argue that because both *Caparaz* and *Govan* had been decided before the court sentenced defendant, the trial court is presumed to have understood the scope of its discretion as clarified in *Govan*. (See *People v. Gutierrez* (2009) 174 Cal.App.4th 515, 527 ["[I]n light of the presumption on a silent record that the trial court is aware of the applicable law, including statutory discretion at sentencing, we cannot presume error where the record does not establish on its face that the trial court misunderstood the scope of that discretion."].) The record indicates, however, that the trial court did *not* understand the scope of its discretion.

The trial court's comments during the sentencing hearing suggest that the court was inclined to impose a shorter aggregate sentence but concluded it lacked discretion to do so. Regarding the court's inclination toward leniency, the court stated that it gave the court no "joy to impose such a harsh consequence" and that the court tried "to run whatever counts [it] could concurrent" and "tried to do the best [it] can . . . with going through all of the different factors."

But the court also stated it "ha[d] *no discretion* here in terms of imposing sentence" as to J.W. (italics added); that the court "must impose

34

[LWOP]" on count 12; and that the court's "only option" was to sentence defendant to LWOP on count 12 and to run counts 6 and 7 concurrently—"That's the only options." These statements show that the court did not understand that section 654 gave the court the discretion to stay the sentence on count 12 and to instead impose and execute a sentence on count 6 or 7 and stay execution of the sentences on the remaining counts.

The People point out that the trial court stated during the sentencing hearing that it had "considered . . . section 654." The record shows, however, that the court made this comment regarding the counts involving S.C. As the court's comments regarding the counts involving J.W. indicate, the court did not understand the scope of its discretion under section 654 as to those counts.

Because the record shows that the trial court misunderstood the scope of its sentencing discretion and did not clearly indicate that it would have imposed the same sentence if it had understood the scope of that discretion, we must remand for resentencing given the extent of the court's full discretion under section 654. We express no opinion on how the trial court should exercise that discretion.

## C.  Defendant Forfeited His Appellate Claim That His Sentence Is Cruel and/or Unusual

Defendant contends his sentence is cruel and unusual under the Eighth Amendment to the United States Constitution and cruel or unusual under the California Constitution. Defendant acknowledges that "he did not raise this argument" in the trial court. "A claim that a sentence is cruel or unusual requires a 'fact specific' inquiry and is forfeited if not raised below." (*People v. Baker* (2018) 20 Cal.App.5th 711, 720; see *People v. Speight* (2014)

227 Cal.App.4th 1229, 1247 ["A defendant's failure to contemporaneously object that his sentence constitutes cruel and unusual punishment forfeits the claim on appellate review."].) Because defendant did not object to his sentence in the trial court, he has forfeited his argument that the sentence constitutes cruel and/or unusual punishment.

Anticipating a potential forfeiture finding, defendant invites us to exercise our discretion to nevertheless entertain his challenge. We decline to do so.

Defendant is free to raise this issue during resentencing on remand.

## IV.  DISPOSITION

The judgment is reversed and the matter is remanded for the limited purpose of allowing the trial court to exercise its discretion under section 654 as specified in this opinion and to fully resentence the defendant.


RUBIN, J.

WE CONCUR:


McCONNELL, P. J.


DATO, J.


36